**E-FILED**
Tuesday, 27 February, 2007  03:53:44 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

_____

| | |
|---|---|
| UNITED STATES OF AMERICA, EX REL | ) |
| JAMES A. BRADY, III | ) |
| | )  Civil Action No._07-4008_ |
|     Plaintiffs | ) |
| | ) **FILED IN CAMERA** |
| | ) **AND UNDER SEAL** |
| | ) **PURSUANT TO** |
| v. | ) **31 U.S.C. §3730(b(2)** |
| | ) |
| | ) |
| | ) |
| HALLIBURTON COMPANY | )  **DO NOT PLACE IN** |
| KBR, INC | ) **PRESS BOX** |
| | ) |
| | ) **DO NOT ENTER ON** |
|     Defendants, | ) **PACER** |

_____)

**COMPLAINT UNDER THE CIVIL FALSE CLAIMS ACT**

I. ~~PRELIMINARY STATEMENT~~

1. Relator, James A. Brady, III., by and through his undersigned counsel,

   on his own behalf, and on behalf of the United States of America, its

   departments and agencies, brings this action against Defendants for

   money damages and civil penalties arising out of Defendants'

   numerous violations of the Federal False Claims Act ("FCA"), Title

   31, United States Code, Section 3729, ~~et seq.~~,

1

2. The FCA provides that any person who knowingly submits or causes to be submitted a false or fraudulent claim to the government for payment or approval is liable for a civil penalty for each such claim submitted or paid, plus three times the amount of the damages sustained by the government and other relief.  Liability attaches under each statute when a defendant seeks (or causes another to seek) payment from government funds that defendant knows is unwarranted and when false records or statements are knowingly made or used (or caused to be made or used) to get a false or fraudulent claim for government funds paid or approved.

3. Under the long-recognized principle of "reverse False Claims Act" liability, a false statement made to an agency of the U.S. Government is actionable under the False Claims Act when the effect of the false statement is to decrease the liability to the U.S. Government of the maker of the statement by concealing the truth of the matter stated.

4. The FCA allows any person having information regarding a false or fraudulent claim for payment from government funds to bring an action for himself (the "relator" or "qui tam plaintiff") and for the government and to share in any recovery.  The Complaint initially is filed under seal (without service on the defendants during the seal

period) to enable the Government: (a) to conduct its own investigation without the defendants' knowledge, and (b) to determine whether to join the action.

5. Based on those provisions, qui tam plaintiff/relator seeks to recover damages and civil penalties arising from presentation of false records, and statements to the United States Government, made for the purpose of decreasing Defendant's liability to the U.S. Government for $31 million in missing U.S. government property.

## II. THE PARTIES

6. Plaintiff (hereinafter sometimes referred to as "government" or the "United States"), upon whose behalf this action is brought, is the United States of America.

7. Relator, James A. Brady III, 203 Waters Way, Martinez Ga. 30907, has been employed continuously by Defendant, KBR, Inc., since 2005. KBR, Inc., is a wholly owned subsidiary of Halliburton Company, a corporation organized under the laws of Delaware, with its principal place of business at 5 Houston Center, 1401 McKinney, Suite 2400, Houston, Texas, 77010.

8. Defendant's KBR and Halliburton do extensive business in the Central District of Illinois, specifically through Contract No.

DAAA09-02-A-0007.  The latter contract, also known as the Logistics Civilian Augmentation Program ("LOGCAP") contract, was awarded to KBR in December 2001 for a 10 year period, and is administered by the U.S. Army Field Support Command, Rock Island Arsenal, Illinois.

### III. JURISDICTION AND VENUE

9.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

10. Venue in the Central District of Illinois is appropriate under Title 31, United States Code, Section 3732(a) as Defendant has and continues to actively engage in business in this judicial district.  Defendant sells its services and products to the U.S. Army Field Support Command, located in Rock Island Arsenal, Illinois. The alleged fraud and false claims relates to the LOGCAP contract, which was awarded and administered by the U.S. Army field command located in Rock Island, Illinois.

### IV. FACTUAL BACKGROUND

#### A. RELATOR'S EXPERIENCE

4

11. In March 2005, Relator was hired by KBR as an Operations Specialist in Iraq.  On 10 March 2005 Relator was deployed to Mosul, Iraq, which is Defendant's headquarters for their operations in Northern Iraq (hereinafter referred to as "H-Sites).

12. Shortly after arrival in theater, Relator was deployed to Forward Operating Base (FOB) Sykes (H-5) in Tal Afar, Iraq, at that time the U.S. Army's most northern FOB in Iraq. Relator served at this location until August 2005, when he was promoted to the position of Operations Coordinator and reassigned to Defendant's Northern Headquarters on Camp Diamondback (H-2) in Mosul.

13. Relator served in this position until May 2006 when he received a lateral transfer to the Defendant's H-Sites Subcontracting Department on FOB Marez (H-4) co-located with FOB Diamondback in Mosul. Relator held the position of Associate Subcontracts Administrator in the Subcontracting Labor Department until August 2006 when he received a lateral promotion to Property Administrator for Northern Iraq.

## B. THE YUKSEL SUBCONTRACT

14. On or about January 1, 2004, Defendant awarded a subcontract to Yuksel, a Turkish firm based in Ankara, Turkey.  The purpose of this

5

subcontract was to perform Operations & Maintenance ("O&M") under Defendant's prime contract with the United States government, i.e., Contract No. DAAA09-02-A-0007.  The latter contract, also known as the Logistics Civilian Augmentation Program ("LOGCAP") contract, was awarded to Defendants in December 2001 for a 10 year period, and is administered by the U.S. Army Field Support Command, Rock Island Arsenal, Illinois.

15. The LOGCAP contract is a task order based cost reimbursement contract.  The purpose of the LOGCAP contract is to support all operations of U.S. military personnel overseas, including operations, maintenance, and logistics, facilities modification and repair, logistics support, service support, transportation, force protection, and a variety of other functions to assist U.S. forces deployed in both combat and non-combat areas.

16. The costs incurred under the Yuksel subcontract were reimbursed to Defendant by the United States government pursuant to the terms of its LOGCAP contract.

C.  KBR'S INITIAL INVESTIGATION OF THE $80 MILLION OVER-EXPENDITURE UNDER THE YUKSEL SUBCONTRACT

17. On or about 20 July 2006, Mr. John Nichols, H-Sites O&M
    Subcontract Administrator, made a report to the KBR H-Sites chain of
    command that the Yuksel subcontract had been overspent by $80
    million.

18. Defendant's internal investigation of the $80 million overrun began
    on or about 1 September 2006.  It was led by several KBR LOGCAP
    III executives out of KBR Headquarters, Baghdad, including Mr.
    Patrick Overacker (LOGCAP III Deputy Procurement and Materials
    Manager), Mr. Samuel Simmons (LOGCAP III Senior Subcontracts
    Administrator), Mr. Barron Marcee (LOGCAP III Deputy
    Procurement and Supply Manager), and Mr. Remo Butler (Major
    General, U.S. Army, Retired, LOGCAP III Deputy Theater Program
    Manager).  The investigation was also joined by two KBR executives
    from the states:  Mr. Todd Bishop (KBR Director of Government
    Compliance, KBR Headquarters, Houston, Texas) and Mr. Jonathan
    Langford (KBR Government and Infrastructure Investigator, KBR
    Headquarters, Arlington, Virginia).

19. Mr. Barron Marcee, one of the KBR executives and investigators sent
    to Mosul to conduct the investigation, arrived on or about 29 August
    2006.  Relator had daily contact with Mr. Marcee for the entire month

of September in Relator's capacity as H-Sites Property Administrator.
Mr. Marcee met with Mr. Lionel Scott (H-Sites Materials Manager)
and Relator on a daily basis, for two primary purposes: (1) Mr. Scott
and Relator were to aid Marcee in his investigation of the $80 million
dollar over expenditure of the Yuksel subcontract, and (2) They were
to provide daily updates to Marcee on the H-Sites annual Property and
Materials Inventory, being conducted in compliance with KBR's
contractual obligations with the United States Army.

20. During Marcee's first two days of meetings with Scott and Relator
Marcee informed them that he knew at least $31 million, of the $80
million under investigation, that had been lost in unauthorized
purchases of property and materials made under the Yuksel O&M
subcontract.  Further, the property and materials acquired under the
Yuksel subcontract had never been entered into the H-Sites Property
Book, and as a result, there were no official records for that property.

21. There had been numerous complaints previously from the Defense
Contract Management Agency ("DCMA"), as well as the Inspector
General for the Iraq Coalition Provisional Authority, concerning
deficiencies in Defendant's property books.  See Audit Report No. 05-
002; 04-011.

22. Mr. Marcee indicated to Relator that what he did not know is whether or not the unauthorized property and material items purchased had, in fact, ever been delivered to Defendant or the United States Army. There was widespread belief among the investigators and employees that much of the reported missing property and materials had never been delivered or had been diverted to black-market sales.

23. Marcee indicated that part of Relator's duties would be to assist him in determining if those items had actually been delivered. Marcee stated that Relator was to accomplish this task by conducting a re-inventory of all the H-Site warehouses and by preparing by-item lists of everything that Relator found.

24. Marcee had a hard copy MS Excel Spreadsheet, approximately 40 to 45 pages in length, which listed all the items he believed to be missing or unaccounted for. While he pointed out particular items on the document to Mr. Scott and Relator, Marcee refused to provide a copy to either of them. Marcee indicated that he would later compare what Scott and Relator found during their inventory against his master MS Excel spreadsheet. Marcee further indicated that he would conduct this comparison on his own, and privately.

25. In compliance with this guidance, Mr. Scott and Relator jointly developed and executed a plan to complete both the missions assigned to them by Marcee. First, to complete the H-Site's Annual Property and Materials Inventory, already in progress, which involved a physical inspection to determine whether items entered into the H-Sites Property Book were in fact present at the H-Sites. Second, and as a separate mission, to attempt to find the $31 million dollars in missing property purchased under the Yuksel subcontract that had never been entered into the H-Sites Property Book.

D.  THE ANNUAL KBR H-SITES 2006 PROPERTY AND
    MATERIALS INVENTORY

26. The H-Sites 2006 annual inventory was conducted by approximately 25 Client Owned Equipment Specialists under the direction and guidance of the Property Administrator (i.e. Mr. Doug Bellah, June 06 to 5 Aug 06 and then Relator 5 Aug to 31 Sep 06), from approximately 1 June 2006 to 31 September 2006.

27. In accordance with KBR's approved Property Control Procedures for inventory, each of the H-Sites COES employees inventoried each of the H-Sites' 198 departments, viewing each department's hand-receipt, physically inspecting each piece of property available for inspection, and annotating for record which items were found and

which items could not be found.  At the end of each duty day, from
approximately 1 June 2006 to 31 September 2006, the H-Sites Area
Property Headquarters prepared and submitted a formal report
summarizing the inventory findings of the day. The daily report was
submitted electronically, via e-mail to the LOGCAP III Property
Headquarters in Baghdad with copies furnished to the H-Sites Project
Manager (PM), the individual camp site managers, the H-Sites
General Manager, the H-Sites Procurement and Supply Manager, and
beginning the first week of September 2006, to Mr. Barron Marcee.

28. The daily summary report includes the total number of line items on
the H-Sites Property Book, the dollar value of those total items, the
number of line items accounted for as of that reporting date, the dollar
value of those items, and the number of remaining items to be
accounted for as well as the dollar value of the same.

29. On 31 September 2006 the inventory was complete and on 1 October
2006 Relator submitted the annual H-Sites 2006 Property and
Materials Inventory Report to LOGCAP III headquarters as a
completed product with required appendices.  This inventory was then
submitted by Defendant to the Defense Contract Management Agency
("DCMA") on October 1, 2006, with a comment that all property

records were in agreement with the physical inventory, with the
exception of the missing items list.

30. The inventory, from a Property Department standpoint was a success
in terms of more property found in 2006 than 2005 from an even
greater H-Sites Property Book in terms of line items and dollar value.
The H-Sites Property Book listed 53,245 line items valued at
$281,611,962.99 on 5 August 2006, the date Relator was assigned as
H-Sites Property Administrator.  Relator's COES inventory team
successfully inventoried and documented 51,813 (i.e. 97.31%) of the
listed H-Sites Property Book line items with a total dollar value of
$279,155,265.49.

31. The inventory team was initially unable to find 1,432 items. Sixteen
additional items were found within the next 24 hours leaving a total of
1,416 items that could not be found.  The missing items were
annotated on the LDD missing items list and have a total dollar value
of $2,456,697.50.

32. These missing items included one hundred and eighty-five (185) air
conditioning units, forty-three (43) refrigerators; two (2) generator
units valued at $98,608, eight (8) motor vehicles valued at $381,292;
forty-five (45) hand held Motorola radios; five (5) satellite telephones;

two (2) incinerator units valued at $136,867.50 each; one (1)

refrigeration unit valued at $21,500; one (1) Cannon Copier valued at

$32,500; one (1) latrine unit valued at $12,200; one (1) shower unit

valued at $13,000; one (1) trailer office unit valued at $12,755; six (6)

14,000 gallon waste water tanks valued at $64,750 and four (4) 50,000

liter fresh water tanks valued at $76,000 (reportedly sold to KBR by

Yuksel); one (1) tire mounter valued at $13,165; and one (1) oil filter

crusher valued at $12,895.

E.   THE SEARCH FOR THE $31 MILLION IN MISSING
     PROPERTY PURCHASED UNDER THE YUKSEL
     SUBCONTRACT

33. Separately from conducting the annual inventory, Relator was

assigned by Marcee with the task of finding the $31 million in missing

property and materials, purchased from Yuksel, and **never** placed on

the Property Books.

34. Relator's search yielded the following additional items that had never

been placed on the H-Sites Property Book. However, as described

below, these items did not in any way approximate the $31 million in

missing property and materials that had been purchased through the

Yuksel subcontract.

35. Relator and his COES inventory team discovered approximately 794 brand new air conditioners (still in their original containers) stored in the H-4 FOB Marez Warehouse, the first week of September 2006 (approximately 3 weeks before the inventory was to be completed). They verified their serial numbers against the property book and discovered that none of these air conditioners had ever been entered on the H-Sites Property Book.  The approximately value of the individual air conditioners was $450 each for an approximate total value of $357,300.00

36. Relator's assistant, Mr. Safou Atwi (H-Sites Senior COES), was put in charge of inventorying these A/Cs, by serial number and placing them on the Property Book.  To accomplish this mission Relator had to obtain two additional Client Owned Equipment Specialist (COES) personnel from the H-2 Diamondback Property Office (Ms. Mary Culliver, and Ms. LaTonya Newton) to work in the H-Sites Property Headquarters office.  These individuals worked for a period of about three days to five days where their sole mission was to simply enter all the newly discovered air conditioning units onto the H-Sites Property Book.

37. In addition to the air conditioning units, Relator and his inventory team also discovered 5 unmarked and unserial numbered generators in nearly new condition at the H-Sites area Generator Repair Grounds. The five generators had no distinguishing marks, serial numbers, or company markings. The generators appeared to have been deliberately stripped of any identifying marks.

38. Relator asked the H-Sites Generator Manager, Mr. Norman Mabe, why these generators were not on the H-Sites Property Book, and why they were not marked.  He responded that he did not know where they had come and why they were not marked but that Army personnel had dropped them off several evenings back without leaving any paperwork. He further stated that he was in the process of disposing of them. Relator asked Mr. Mabe the approximate value of the generators.  He responded that they would sell commercially for approximately $75K to $120K each.

39. Mr. Mabe discouraged Relator from further investigating the source of these generators and why they were not listed on the H-Sites Property Book, stating that the matter was outside of Relator's inventory responsibilities.

40. Relator later reported finding these generators to Mr. Jerry Phillips, H-Sites Deputy Project Manager for Operations and former General Manager. Mr. Phillips informed Relator that the "Army always did this sort of thing," that the Army was probably expecting repairs and that Relator "should not to be concerned."

41. Relator also reported finding the generators to Marcee, who told him that the GPA (Government Property Administrator) Ms. Cheryl Lang, was already aware of the unmarked generators from a previous inspection and they would be disposed of in a few days. This statement did not seem logical to Relator because the Property Office would have had to prepare the paperwork for their disposal and / or transfer from the site.  Neither Relator, nor employees from the Property Office had done so and the GPA, by regulation, could not authorize or approve any movement, disposal, or transfer of property that was not marked. Marcee further instructed Relator not to annotate these generators on the H-sites Property Book.

42. Approximately three days later the five generators were gone and Relator was informed by Mr. Mabe that the Army had retrieved them. Relator checked later that day with the Army Property Book Administrator on H-4 FOB Marez who stated that he knew nothing

about five unmarked generators either being dropped off at the KBR

Generator Maintenance and Repair Grounds or being retrieved.

F.   REPORTS OF PROPERTY LOCATED IN REMOTE BUNKERS
     NOT PLACED ON THE PROPERTY BOOK

43. With the exception of approximately 794 air conditioning units and

the five unmarked generators, Relator and his inventory team found

nothing more in the way of property not already listed on the H-Sites

Property Book. The value of the air conditioning units and the

generators did not in any way approximate the total of $31 million in

missing property purchased under the Yuksel sub-contract.

44. While Relator was unable to locate any additional property or

materials other than the air conditioning units and the five unmarked

generators, Relator had received information that such property

existed. This property was hidden in remote site bunkers, and was not

listed on the H-Sites Property Book.   However, as described below,

Relator was prevented from inspecting these bunkers.

       (1) Reports of Unaccounted for Property in H-4 FOB Marez
       Bunkers

45. During the month of September 2006, several employees within the

H-4 KBR trades sections (i.e. Carpentry, Plumbing, Electrical,

HVAC, and Power Generation) privately and repeatedly suggested to

Relator's supervisor, Mr. John P. Jones, Procurement and Supply Manager for the H-Sites, that he, Mr. Scott, and Relator tour the H-4 remote site bunkers. These bunkers were located in the far recesses of the camp where the former Iraqi Army trained under Saddam Hussein's rule. Special permission had to be obtained from the military to open and go into these bunkers.  Mr. Jones and Relator were told by these employees that they would find hundreds of property and material items that had been purchased and never put on the H-Sites Property Book to include new generators, copper piping, large spools of wire, lumber, oil, lubricants, filters, etc.

46. Relator repeatedly asked Mr. Jones, during the month of September 2006, if he would obtain permission to allow Relator to go into these bunkers.  In each instance, he refused, said he would get back to Relator on it, or pretended that he didn't hear Relator's question.

47. When Relator raised the issue of searching the remote site bunkers with Marcee, the latter indicated that he "knew nothing was there," despite reports to the contrary, and that Relator and his inventory team were to confine their inventory only to the H-Site warehouses that he specified.

> (2)   Report by Mr. Ron Parmenter, H-4 Power Generator Mechanic

48. Following Relator's termination on 17 Oct 06, Relator encountered a Mr. Ron Parmenter (KBR Employee ID No. 332441) who was an H-4 Power Generation Mechanic.

49. Mr. Parmenter asked Relator if he had ever received permission to enter the remote site bunkers.  Relator told him that he had not. Parmenter informed Relator that he had personally witnessed the off-loading and storage of numerous property and material items, to include brand new $100K (+) generators into these bunkers. Parmenter stated that these items had been covertly placed in the bunkers without ever being processed through the Central Distribution Warehouse (CDW - also located on H-4) in violation of KBR's Property and Control Procedures (PCP).  In compliance with KBR's PCP, all newly purchased property and materials must be processed through the CDW, and property valued at more than $450 is placed on the H-Sites Property Book after receipt is acknowledged and documented.

50. Mr. Parmenter further indicated that he had personally witnessed: (1) Unidentified personnel take new generators from these bunkers, as well as air filters, lubricants, and other parts and materials and deliberately place them in the H-4 Scrap Metal Yard during night time

hours for no apparent reason. The H-4 Scrap Metal Yard is located

approximately a half mile away from the H-Sites Power Generator

Storage and Repair Grounds, and (2) He personally witnessed

unbadged local Iraqi's retrieve the new generators and other new

material items including air filters, from the scrap metal yard the

following morning, place them on a truck, and drive off the base with

them unimpeded.  He stated to Relator that he saw this occur

numerous times and that he was certain that a black market operation

was in progress.

### (G)  DIRECTION TO MANIPULATE SUMMARIZED INVENTORY RESULTS

51. On or about 26 Sep 06, Marcee called for a meeting of Relator, Mr.

Lionel Scott, and Mr. Derrick Harper.  Marcee directed the

participants to prepare a summarized report of the Property and

Materials "found" during the period of 30 August to 28 September

2006.  He indicated that this report would be used in support of the

on-going Yuksel O&M subcontract investigation and that he needed

to submit the summary to Steve Arnold, LOGCAP III Vice-President,

by close of business 30 Sep 06.

52. The specific elements he asked Relator ,Scott, and Harper to identify

in the Inventory Summary Report were:

1. Total Line Items Inventoried as of 30 August 06 and their Total Dollar Value

2. Total Line Items Inventoried as of 29 September 06 and their Total Dollar Value

3. What Marcee called the "Delta Factor" (i.e. the Total Number of Line Items inventoried from 30 Aug to Sep 06 and their Total Dollar Value.

4. Total Line Items of H-1 Property Stored and Inventoried at the H-4 Warehouse & their Total Dollar Value

5. Total Power Generation Department Line Items Inventoried and their Total Dollar Value

6. Total Number of H-Site Regional Generators and Line Items Inventoried at the H-4 Regional Power Generation Grounds and their Total Dollar Value

53. Marcee directed that Relator coordinate the report with Scott and Harper from the Materials Department, prepare the report, and submit it to him by close of business 29 Sep 06, so that he could review the summary and provide it to Steve Arnold  by close of business 30 Sep 06.  Relator began his coordination with Scott and Harper

immediately, and then began preparing the Property Department

portion of the summary.

54. The morning of 29 Sep 06, two days before the inventory summary

would be complete, Marcee called another meeting of Relator, Scott,

and Harper.  At this meeting Marcee asked if they could complete the

report by 5:00 p.m. that day.  Relator indicated that he could complete

the Property Department data by noon and deferred to Scott and

Harper as to when the Materials data could be completed. Scott and

Harper agreed that they could have the Materials data to Relator by

4:00 p.m. for a 5:00 pm submission to Marcee.

55. Early that afternoon Marcee sent an e-mail informing Relator, Scott,

and Harper that he now had to report to Steve Arnold at 3:30 p.m. and

could they have the report ready by 3:00 p.m. instead of 5:00 p.m.

Relator, Scott, and Harper agreed that they could.  At this point

Harper and Relator coordinated together, and Harper provided Relator

with the Materials data at about 2:00 p.m.  Relator added the Materials

data to the Property summary, and then Relator and Harper checked

and rechecked their work for accuracy.  They were both satisfied that

they had completed an accurate summary of the Property and

Materials inventoried from 30 August to 28 September and sent the report to Marcee at 3:00 p.m. as he had requested.

56. The Inventory Summary Report showed that the property and materials teams had found an additional $3.5 million in property, and $1.6 million in materials, over and above the amounts reflected in the August 30, 2006 inventory.

57. Ninety minutes later (4:30 p.m.) Marcee called for an immediate meeting of Relator, Scott, and Harper.  Marcee stated that the report had to be wrong because he knew that they had found far more property and material than they had reflected on their Inventory Summary Report, and that they had probably come close to finding all of the missing $31 million dollars in property and materials.  Relator informed Marcee that the Property numbers were correct and that the Property Department had tracked and reported all their findings, daily, since June 2006.  Scott and Harper affirmed that their Materials data was correct, as well, and that it had been taken from internal records they had been keeping each day since the inventory began.

58. At that point Marcee became angry, and indicated that he came to the H-Sites to find $31 million dollars in missing materials and property, and that the summary given to him showed only an additional $5

million found, and that Relator and other members of the inventory team would be fired if they were unable to show any additional missing materials and property.

59. Relator protested that the numbers provided were accurate, and further reminded Marcee that he had refused to provide to the inventory team with a copy of the Excel spreadsheet of lost and missing property purchased under the Yuksel subcontract, thereby making it more difficult for the inventory team to find that property.

60. Marcee then directed Relator, Harper and Scott to provide falsified numbers on the Inventory Summary Report.  The purpose of this falsification would be to make it appear as though the inventory team had found more of the lost and missing property purchased under the Yuksel subcontract than it actually had.

61. Specifically, Marcee instructed Relator to add the H-1 Property numbers (i.e. Line 4: $1,047,422.87 – 740 Items), the Regional Power Generator numbers (i.e. Line 6: $4,086,415.02 – 69 Items), and the Tab B ( "Other Regional Power Generation Property Items" at $292,627.59 – 107 Items) to the Delta on Line 3 (i.e. $3,522,576.93) for a new total (i.e. $8,949,042.41). This would be $5,426,465.48 higher than the original total. Then subtract the same $5,426,465.48

from the Base line total on Line 1, thereby suggesting that
$5,426,465.48 more in missing or lost property was found between
August 30, 2006 and September 28, 2006 than actually had been
found.

62. Relator immediately reported Marcee's unethical and unlawful
directive to Mr. Charles House, H-Sites Employee Relations Officer.
House indicated that he would make a report of the situation to his
higher headquarters and would monitor the situation.

63. After a brief consultation with higher headquarters, House asked
Relator to resubmit the incorrect numbers as requested by Marcee, but
not to sign anything.   House further assured Relator that Steve
Arnold, LOGCAP III Vice-President, would receive an accurate
report of the situation.

64. At 9:40 p.m. on September 29, 2006, Relator submitted the incorrect
property numbers to Marcee, exactly as Marcee directed.   However,
this submission was not in the form of a complete report, and further
omitted any revised Materials numbers.  Marcee sent an e-mail back
to Relator indicating that the report was due in complete form first
thing in the morning, including the "revised" numbers for both
property and materials.

65. The morning of 30 Sep 06, Harper provided Relator with revised and falsely inflated Materials numbers.  Harper increased the Materials Delta Line 3 from $1,623,590 to $9,820,933.50, thereby indicating that $9,820,933.50 in lost materials had been found between August 30th and September 28th, when in fact only $1,623,590 had been found.  This report was hand delivered by Relator to Marcee, at their 30 Sep 06 morning meeting.

66. Harper's new Delta Line figure of $9,820,933.50, added to Relator's own "revised" Delta Line of $8,949,042.41, yielded a new combined Delta of $18,769,975.91.  The new, inflated, and falsified total was $13,623,808.98 over the original Line 3 "Delta" of $5,146,166.93, thereby falsely indicating that an additional $13,623,808.98 in missing property and materials was found as a result of the inventory, when in fact such property had not been found.

67. The following day Marcee requested that the report be revised one more time to look more believable and plausible.  Marcee stated that the auditors may not believe that the inventory team was actually able to find $13,623,808.98 more in lost or missing property than it really had.  Accordingly, Marcee instructed Relator, Scott, and Harper to

shave $5 or $6 million off the value of the materials and property found by the inventory team.

68. As requested by Marcee, Harper and Relator "shaved the numbers" until they reached a final combined Delta of $9,386,401.19 (i.e. Property Delta: $5,426,465.50 and Materials Delta: $3,959,935.69). As such, the revised summary indicated that $9,386,401.19 in missing and lost property had been found, when in fact the inventory team was only able to find $5,146,166.93.

69. Relator immediately reported the updated events to Mr. House. House inquired as to whether Scott, Harper, or Relator had signed anything and Relator responded that they had not.  Mr. House said that "everything was under control," and that he would follow-up with Relator in a few days.

70. On October 6, 2006, Relator requested that Marcee provide him with a copy of the final Inventory Summary Report he submitted to Steve Arnold, LOGCAP III Vice-President.  A copy of this report was provided that same day.

71. The final report shows an "Overall Total Dollars Recovered" figure of $11,747,399.00.  This figure was achieved by adding Line 4 (i.e. $586,513.86) and Line 5 (i.e. $1,774,483.95) of the Materials column

to the final Delta figure contained in the previous Inventory Summary. As such, the report that went forward to LOGCAP HQ showed total property recovered during the inventory in the amount of $11,747,399, when in fact the inventory team was only able to find $5,146,166.93.

72. Relator sought an opportunity to present this situation to the appropriate authorities, and contact was immediately made with the U.S. Army Criminal Investigation Division ("CID").  On October 10, 2006, Jennifer Bryan, a U.S. Army CID Agent from Washington, D.C. interviewed Relator over the telephone for approximately ninety minutes on everything that had transpired.

H. RELATOR'S TERMINATION FROM KBR

73. On or about 7 October 2006 Relator contacted Leroy Hill, LOGCAP III Property Manager, and discussed with him his intentions to leave the H-Sites Property Department.  As a result, Relator suggested that a replacement be sent to the annual Property and Materials Conference to be held at Camp Anaconda, south of Baghdad, 10 to 16 October 2006.   A replacement attended the conference, in Relator's place, with the chain of command's full knowledge and permission.

74. On or about 17 October 2006, Marcee stated that it had come to his attention that Relator had accused him (Marcee) of  making false reports to LOGCAP III Headquarters.  Shortly thereafter, Marcee called Relator into the Human Resources office, and provided him with a copy of a Termination notice, officially terminating his employment from Defendant.

75. The Termination Notice stated that Relator had failed to attend the annual Property and Materials conference without informing his supervisor.  This allegation was baseless, and was a pretext for the real basis for the termination; i.e. Relator's refusal to acquiesce in providing false inventory reports to the LOGCAP HQ.

76. Shortly after receiving the termination notice, Relator met with LTC Richard Fenoli, FOB Commander for H-2 Diamondback and H-4 Marez.  Relator described the preceding events to LTC Fenoli, who responded by promising support for reinstatement.

77. Shortly after the Fenoli meeting, Relator was detained by Defendant's security personnel with instruction to prevent him from meeting with any other military officials.

78. On October 18, 2006, Relator wrote a personal e-mail to Mr. Arnold, LOGCAP III Vice-President, requesting an appointment to discuss his

termination.  On or about October 20, 2006, a 90 minute meeting

occurred in Steve Arnold's office in Baghdad. Present at the meeting

were Relator, Arnold, and several other LOGCAP III officials.

79. On October 22, 2006, Arnold approved Relator's reinstatement, as

well as a transfer to Afghanistan to serve as an Operations

Coordinator for Defendant.

80. This transfer to Afghanistan occurred on October 23, 2006.

<u>COUNT ONE</u>
<u>(Reverse False Claims Act Liability)</u>

81. Plaintiff repeats and realleges each and every allegation contained in

Paragraphs 1 through 80 of this Complaint.

82. Pursuant to 31 U.S.C. § 3729(a)(7), any person who knowingly makes

or causes to be made a false record or statement to conceal or to

decrease an obligation to pay money to the government is liable for a

civil penalty of not less than $5,000, and not more than $10,000, plus

three times the amount of damages which the government sustains

because of such act.

83. Defendant invoiced and received payment for the $31 million in

missing and lost property purchased under the Yuksel subcontract.

84. Title to all the property furnished under the Yuksel subcontract passed to the United States government under the provisions of 48 CFR 52.245-5 and Part 45 of the Federal Acquisition Regulations ("FAR").

85. Pursuant to FAR 45.505 (a), Defendant's property control records constituted the Government's official property records. Official Government property records must identify all Government property and provide a complete, current, and auditable record of all transactions.

86. Pursuant to FAR 45.506 a, Defendant was required, upon receipt of Government property, to promptly (1) identify the property in accordance with agency regulations; (2) mark the property so as to identify it as government property; and (3) record the property in its property control records.

87. Pursuant to FAR 45.504, Defendant was required to investigate and report to the government all cases of loss, damage, or destruction to government property in its possession or control as soon as the facts become known.

88. Pursuant to FAR 45.502, Defendant was required to establish and maintain a system to control, protect, preserve, and maintain all Government property, and to maintain and make available property

control records and account for all Government property in its

possession.  Pursuant to this provision, when unrecorded Government

property is found, Defendant was required to advise the government

of both the cause of the discrepancy and actions taken or needed to

prevent recurrence of the same.

89. FAR 45.508 required that the Defendant periodically physically

inventory all Government property in its possession or under its

control, and to submit to the government promptly after completing

such physical inventory: (a) a listing that identifies all discrepancies

disclosed by a physical inventory. (b) a signed statement that physical

inventory of all or certain classes of Government property was

completed on a given date and that the official property records were

found to be in agreement except for discrepancies reported.

90. Pursuant to FAR 52.245-5, Defendant was responsible for the loss of

any government property in its possession that resulted from willful

misconduct or lack of good faith on the part of its managerial

personnel; or that resulted from a failure on the part of the Defendant,

due to willful misconduct or lack of good faith on the part of its

managerial personnel, to establish and administer a program or system

for the control, use, protection, preservation, maintenance, and repair of Government property.

91. Defendant knowingly made false statements in its property inventory records for the purpose of concealing its obligation to pay for government property for which it was responsible.

92. Defendant knowingly made false statements in its property inventory records for the purpose of misleading the government as to the extent of government property in its possession for which it was unable to account.

93. The action of Defendant in knowingly making false statements in its inventory records established lack of good faith and willful misconduct on the part of Defendant's managerial personnel.

94. Defendant knowingly made false statements in its property inventory records for the sole purpose of decreasing its liability for the $31 million in lost or missing property purchased under the Yuksel subcontract.

## COUNT II

(Defendant Engaged In Unlawful Discriminatory and Retaliatory Conduct Against Relator In Violation Of 31 U.S.C.§ 3730(h) Of the False Claims Act)

95. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 94 of this Complaint.

96. Relator on numerous occasions requested that his superiors institute corrective actions in connections with the false inventory reports alleged herein.

97. Relator exercised his lawful right to bring the matters complained of herein to the attention of the LOGCAP chain of command and to the Army CID;

98. In retaliation therefor, Relator was terminated from his employment, thereby causing Relator to incur attorney fees and other expenses for the purpose of seeking reinstatement

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Relator respectfully requests this Court to enter judgment against defendants as follows:

(a) That the U.S. be awarded damages in the amount of three times the damages sustained by the U.S. because of the false claims and fraud alleged within this Complaint, as the Civil False Claims Act, 31 U.S.C. §§ 3729 et. seq. provides;

(b) That civil penalties be imposed for each and every false claim that defendant presented to the U.S. government;

(c) That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d) That the Relator be awarded the maximum amount allowed to him by the False Claims Act; and

(e) For Count II, that Relator be granted all relief necessary to make him whole, included but not limited to two times any compensatory and special damages sustained as a result of defendant's retaliation; and

(f) That this Court award such other and further relief as it deems proper

## DEMAND FOR JURY TRIAL

Relator, on behalf of himself and the United States, demands a jury trial on all claims alleged herein.

Respectfully submitted,

Jeffrey A. Lovitky
Attorney at Law
1735 New York Avenue, N.W.
Suite 500
Washington D.C. 20036
Tel: (202) 429-3393

ATTORNEY FOR RELATOR

Dated: *FEB 27, 2007*